

**FELONY**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

### INDICTMENT FOR CONSPIRACY TO COMMIT HONEST SERVICES WIRE FRAUD, HONEST SERVICES WIRE FRAUD, AND BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 25-00221 |
| v. | * | SECTION: SECT. H MAG. 4 |
| MAHMOUD ALHATTAB<br>CHRISTOPHER BRYAN BURNS<br>JENAY DAVIS<br>SHAKIRA MILLIEN<br>JONATHAN PARSONS<br>MARLINE ROBERTS | *<br>*<br>*<br>* | VIOLATIONS: 18 U.S.C. § 666(a)(2)<br>18 U.S.C. § 666(a)(1)(B)<br>18 U.S.C. § 1343<br>18 U.S.C. § 1346<br>18 U.S.C. § 1349 |

\* \* \*

The Grand Jury charges that:

## COUNT 1
### (Conspiracy to Commit Honest Services Wire Fraud)

A.   **AT ALL TIMES MATERIAL HEREIN:**

*Commercial Driver's Licenses*

1.   The Federal Motor Carrier Safety Administration ("FMCSA") was part of the United States Department of Transportation and was charged with the nationwide regulation of the

trucking and motor carrier industry. FMCSA's primary mission was to reduce crashes, injuries, and fatalities involving large trucks and buses.

2. Federal law required a driver to possess a commercial driver's license ("CDL") to operate certain heavy or large vehicles, such as tractor-trailers and school buses. Each CDL was issued as Class A, Class B, or Class C. A Class A CDL was required to operate any combination of vehicles with a gross combination weight rating over 26,000 pounds if the gross vehicle weight rating of the vehicle being towed was over 10,000 pounds. A Class B CDL was required to operate any vehicle that had a gross weight rating over 26,000 pounds or any such vehicle towing a vehicle with a weight rating not exceeding 10,000 pounds. A Class C CDL was required to operate any combination of vehicles that did not fall within Class A or Class B and that were designed to transport 16 or more people or were transporting certain hazardous materials. A Class A CDL permitted the operation of all vehicles for which a Class B or a Class C CDL was required.

3. Federal law required each state to adopt and carry out a program for testing and ensuring the fitness of individuals to operate commercial motor vehicles consistent with the minimum standards prescribed by the Department of Transportation. Federal law allowed states to issue CDLs only to individuals who passed written and driving tests that complied with the federal standards.

4. FMCSA regulations set mandatory standards for CDL licensing and made each state's CDL program subject to FMCSA's review for compliance. The regulations required states to administer written tests, which were also known as knowledge tests, and skills tests, which were also known as road tests and driving tests. The regulations also provided specific requirements for those tests.

5.  Each state's knowledge test was required to ensure that applicants possessed sufficient knowledge of, among other topics: vehicle inspection, repair, and maintenance requirements; procedures for safe vehicle operations; controls and instruments commonly found on commercial motor vehicles; vehicle safety systems and their use in emergency situations; proper procedures for performing various basic maneuvers, backing maneuvers, and emergency maneuvers; speed management; night operation; extreme driving conditions; and hazard perceptions.

6.  Each state's skills test was required to include testing in three types of skills. First, there was testing in pre-trip vehicle inspection skills, which included identifying each safety-related vehicle part and explaining what needed to be inspected to ensure the part's safe operating condition. Second, there was testing in basic vehicle control skills, including demonstration of a variety of driving maneuvers and behaviors. Third, there was testing in safety-related on-road driving skills, including a variety of maneuvers and behaviors.

7.  Beginning February 7, 2022, the regulations required most CDL applicants to successfully complete Entry-Level Driver Training prior to taking the skills test. For example, Entry-Level Driver Training was required for applicants seeking a Class A or Class B CDL for the first time and for applicants seeking certain endorsements, such as those for operating a school bus. The regulations set the minimum training requirements, such as the applicant operating a commercial vehicle on a public road and the instructor documenting the applicant's proficiency in various skills. Entry-Level Driver Training could only be administered by entities that were registered as training providers in a FMCSA electronic database called the Training Provider Registry. Such entities, and the instructors they employed, were required to hold certain qualifications specified in the regulations. The regulations required training providers to certify a

CDL applicant's successful completion of required Entry-Level Driver Training in the Training Provider Registry. States were required, prior to conducting skills tests, to electronically verify that applicants successfully completed required Entry-Level Driver Training.

8. The regulations permitted states to have third parties administer skills tests. Third-party testers were persons and entities authorized by the state to employ skills test examiners. Third-party examiners were persons who were employed by authorized third-party testers and who were authorized by the state to administer the skills test.

9. The regulations imposed various requirements on such third parties and required that the skills tests they administered be the same as those that would otherwise be given by the state. The regulations required third-party testers to maintain copies of skills test scoring sheets and to notify their states through electronic means whenever applicants passed the skills test.

10. Many states, including Louisiana, utilized an electronic database called the Commercial Skills Test Information Management System ("CSTIMS") to record skills test results and information relevant to CDL applications. CSTIMS was funded by FMCSA grants. All CSTIMS's servers were located outside the state of Louisiana.

*Louisiana CDLs*

11. In Louisiana, CDLs were issued by the Office of Motor Vehicles ("OMV"), which was part of the Louisiana Department of Public Safety and Corrections ("DPSC"). DPSC was a state agency that received federal assistance from the Commercial Driver's License Program Implementation Grant Program, a FMCSA program that provided financial assistance to activities that supported the development, implementation, and maintenance of CDL programs or that had a direct impact on a state's compliance with federal CDL regulations.

12. In Louisiana, the knowledge test was administered by authorized OMV personnel at OMV offices. Upon passing the knowledge test, an applicant received a commercial learner's permit from OMV personnel.

13. Only after passing the knowledge test and obtaining a commercial learner's permit could an applicant take the Louisiana skills test. Furthermore, beginning February 7, 2022, most Louisiana CDL applicants needed to have successfully completed Entry-Level Driver Training before taking the skills test. Entry-Level Driver Training data for Louisiana CDL applicants was routinely imported into CSTIMS from the Training Provider Registry.

14. Louisiana law authorized third parties to act on behalf of DPSC in the administration and reporting of skills tests. Louisiana law required that third parties be state-certified, meet the same qualifications and training as state examiners, and give the same tests that would otherwise be given by the state. To obtain certification, third parties needed to meet various qualifications and agree to various conditions including maintaining a copy of the scoring sheet for each skill test administered.

15. A Louisiana third-party tester could conduct a skills test only after verifying that an applicant held a commercial learner's permit. Additionally, after February 7, 2022, unless the applicant was subject to an exception from Entry-Level Driver Training requirements, third-party testers could administer the skills test only if CSTIMS indicated that the applicant completed Entry-Level Driver Training.

16. Louisiana third-party testers entered skills test results into CSTIMS. Each entry of a skills test result into CSTIMS from a location in Louisiana constituted an interstate wire communication.

17. After an applicant passed the skills test, the applicant would visit an OMV office and request a CDL. Authorized OMV personnel would then issue the CDL after verifying in CSTIMS that a third-party tester had reported that the applicant passed the skills test. Accessing skills test results in CSTIMS from a location in Louisiana constituted an interstate wire communication.

*Relevant Individuals*

18. **MAHMOUD ALHATTAB** ("**ALHATTAB**") resided and operated a restaurant business in the Eastern District of Louisiana.

19. **CHRISTOPHER BRYAN BURNS** ("**BURNS**") operated a certified Louisiana third-party tester business, which was in the Eastern District of Louisiana, and which employed him as a certified third-party examiner. As a third-party examiner, **BURNS** was an "agent" (as that term is defined in Title 18, United States Code, Section 666(d)(1)) of, and owed a fiduciary duty to, DPSC. Additionally, beginning in or around October 2021, **BURNS** operated an Entry-Level Driver Training provider business that was registered in the Training Provider Registry.

20. **JENAY DAVIS** ("**DAVIS**") was employed by the City of Donaldsonville from in or around June 2022 until in or around December 2023. In this employment, **DAVIS** was assigned to work as a "Motor Vehicle Clerk" at the OMV office located in Donaldsonville, Louisiana, and had the duties and responsibilities of a DPSC OMV employee. Beginning in or around November 2023, **DAVIS** became employed by DPSC as a "Motor Vehicle Compliance Analyst 1" with the OMV. For both the City of Donaldsonville employment and DPSC employment, **DAVIS** principally worked at the Donaldsonville OMV office, her duties included administering knowledge tests and issuing commercial learner's permits and CDLs, and she was an "agent" (as

that term is defined in Title 18, United States Code, Section 666(d)(1)) of, and owed a fiduciary duty to, DPSC.

21. **SHAKIRA MILLIEN** ("**MILLIEN**") was employed by DPSC as a "Motor Vehicle Office Manager A" with the OMV. **MILLIEN** principally worked at the OMV office located in Donaldsonville, Louisiana. **MILLIEN's** duties included administering knowledge tests and issuing commercial learner's permits and CDLs. As a "Motor Vehicle Office Manager A," **MILLIEN** was an "agent" (as that term is defined in Title 18, United States Code, Section 666(d)(1)) of, and owed a fiduciary duty to, DPSC.

22. **JONATHAN PARSONS** ("**PARSONS**") was employed by **BURNS's** tester business as a certified third-party examiner until in or about January 2022. From approximately June 2022 to December 2023, **PARSONS** was employed as a certified Louisiana third-party examiner with a third-party tester business, Tester-A. While employed by Tester-A, **PARSONS** was able to enter into CSTIMS results for tests conducted by another Tester-A examiner, **MARLINE ROBERTS**. Additionally, beginning in or around December 2021, **PARSONS** operated his own Entry-Level Driver Training provider business, which was located in the Eastern District of Louisiana and registered in the Training Provider Registry. Beginning in or about December 2023, **PARSONS's** training business also became a certified Louisiana third-party tester and employed **PARSONS** as a certified third-party examiner. As a third-party examiner for each tester for whom he worked, **PARSONS** was an "agent" (as that term is defined in Title 18, United States Code, Section 666(d)(1)) of, and owed a fiduciary duty to, DPSC.

23. **MARLINE ROBERTS** ("**ROBERTS**") was a certified Louisiana third-party examiner for Tester-A from about October 2022 to December 2023. As a third-party examiner,

7

**ROBERTS** was an "agent" (as that term is defined in Title 18, United States Code, Section 666(d)(1)) of, and owed a fiduciary duty to, DPSC.

B. **THE CONSPIRACY:**

Beginning at a time unknown, but no later than August 2020, and continuing until in or around February 2024, in the Eastern District of Louisiana and elsewhere, the defendants **MAHMOUD ALHATTAB, CHRISTOPHER BRYAN BURNS, JENAY DAVIS, SHAKIRA MILLIEN, JONATHAN PARSONS,** and **MARLINE ROBERTS** knowingly and willfully conspired and agreed with each other, and with other persons known and unknown to the grand jury, including persons seeking Louisiana CDLs, to devise and intend to devise a scheme to defraud the state of Louisiana, its citizens, and DPSC of the honest services of defendants **BURNS, DAVIS, MILLIEN, PARSONS,** and **ROBERTS**, through their soliciting and accepting of bribes, by transmitting and causing to be transmitted by means of wire communication, in interstate commerce, any writings, signs, signals, pictures, and sounds for the purpose of executing said scheme, in violation of Title 18, United States Code, Sections 1343 and 1346.

C. **MANNER AND MEANS:**

It was part of the conspiracy that:

24. The defendants caused individuals to obtain CDLs without having met the federal and state requirements.

25. **ALHATTAB**, in exchange for payments from persons, arranged for persons to receive CDLs without meeting the requirements.

26. **ALHATTAB** agreed to pay, and did pay, **DAVIS** and **MILLIEN** in exchange for **DAVIS** and **MILLIEN** entering knowledge test answers for CDL applicants, falsely reporting that CDL applicants took and passed the knowledge test, and issuing CDL applicants commercial learner's permits.

27. **ALHATTAB** agreed to pay, and did pay, **BURNS** and **PARSONS** in exchange for **BURNS** and **PARSONS** falsely reporting in CSTIMS that CDL applicants passed the skills test.

28. When **PARSONS** and **ROBERTS** were both employed by Tester-A, **PARSONS** agreed to pay, and would pay, **ROBERTS** in exchange for **ROBERTS** creating false scoring sheets to make it appear that **ROBERTS** had administered the skills test and that the applicants had passed, when, in fact, the applicants had not tested.

29. After the Entry-Level Driver Training requirement took effect, **BURNS** and **PARSONS**, through their training provider businesses, falsely reported in the Training Provider Registry that applicants had completed Entry-Level Driver Training.

30. Typically:

    a. **ALHATTAB** collected money and identifying information from a person seeking a Class A CDL;

    b. **ALHATTAB** provided the person's information to **DAVIS** or **MILLIEN**;

    c. **DAVIS** or **MILLIEN** entered knowledge test answers for the person;

    d. **DAVIS** or **MILLIEN** falsely reported that the person took and passed the knowledge test;

    e. **DAVIS** or **MILLIEN** issued a commercial learner's permit to the person;

    f. **ALHATTAB** used a portion of the payment he received from the person to pay **DAVIS** or **MILLIEN** for entering knowledge test answers for the

person, for falsely reporting that the person took and passed the knowledge test, and for issuing the person a commercial learner's permit;

    g.   **ALHATTAB** provided the person's information to **BURNS** or **PARSONS**;

    h.   **BURNS** or **PARSONS** entered false passing skills test results in CSTIMS for the person without the person having tested;

    i.   **ALHATTAB** used a portion of the payment he received from the person to pay **BURNS** or **PARSONS** for the false passing test entry; and

    j.   the person obtained a Class A CDL without having taken or passed the knowledge or skills test.

31.   At times:

    a.   **PARSONS** asked **ROBERTS** to create a false scoring sheet to make it appear that **ROBERTS** had administered the skills test and that the person had passed;

    b.   **PARSONS** falsely entered in CSTIMS that the person took and passed a skills test administered by **ROBERTS**; and

    c.   **PARSONS** used a portion of the payment he received from **ALHATTAB** to pay **ROBERTS** for creating the false scoring sheet.

32.   For the purpose of executing the scheme, the defendants caused wire communications to be transmitted between the state of Louisiana and outside the state of Louisiana, including through, among other means, the use of CSTIMS, the use of the Training Provider Registry, and internet research to obtain knowledge test answers.

D. <u>OVERT ACTS:</u>

In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed in the Eastern District of Louisiana and elsewhere:

*Overt Acts Concerning Individual-A*

33. On or about February 3, 2023, **ALHATTAB** and **PARSONS** exchanged text messages regarding Individual-A's Entry-Level Driver Training.

34. On or about February 8, 2023, **PARSONS** falsely entered in the Training Provider Registry that Individual-A successfully completed Entry-Level Driver Training.

35. On or about February 16, 2023, **ALHATTAB** sent a text message to **PARSONS** in which **ALHATTAB** indicated in substance that Individual-A should be reported as passing the skills test on Friday February 17, 2023, so that Individual-A could obtain a CDL from an OMV office on Monday February 20, 2023.

36. On or about February 17, 2023, **PARSONS** sent a text message to **ROBERTS** in which **PARSONS** indicated that he would pay **ROBERTS** $400 for falsely reporting that Individual-A passed the skills test.

37. On or about February 17, 2023, **ROBERTS**, as requested by **PARSONS**, created a scoring sheet that falsely indicated that Individual-A took and passed a skills test administered by **ROBERTS**.

38. On or about February 18, 2023, **PARSONS** falsely entered in CSTIMS that Individual-A took and passed a skills test administered by **ROBERTS**.

39. On or about February 20, 2023, at the Donaldsonville OMV office, **MILLIEN** issued Individual-A a Class A CDL.

11

***Overt Acts Concerning Individual-B***

40. On or about December 5, 2023, **ALHATTAB** accepted approximately $6,500 cash from Individual-B and told Individual-B to report to **ALHATTAB's** restaurant the next day to begin the process of fraudulently obtaining a CDL.

41. On or about December 6, 2023, in Individual-B's presence, **ALHATTAB**, in a telephone conversation with **MILLIEN**, stated that **ALHATTAB** and Individual-B were traveling together to the Donaldsonville OMV office.

42. On or about December 6, 2023, at the Donaldsonville OMV office, **MILLIEN** conducted internet research concerning knowledge test questions to aid her in completing the knowledge test for Individual-B.

43. On or about December 6, 2023, at the Donaldsonville OMV office, in **ALHATTAB's** presence, **MILLIEN** issued Individual-B a commercial learner's permit.

44. On or about December 20, 2023, **ALHATTAB** sent **BURNS**, via cell phone messaging, a photograph of Individual-B's commercial learner's permit.

45. On or about December 24, 2023, **BURNS** caused his business to falsely enter in the Training Provider Registry that Individual-B successfully completed Entry-Level Driver Training.

46. On or about December 26, 2023, **BURNS** sent text messages to **ALHATTAB** in which **BURNS** indicated that he would enter in CSTIMS that Individual-A took and passed the skills test that day.

47. On or about December 26, 2023, **BURNS** falsely entered in CSTIMS that Individual-B took and passed the skills test.

48. On or about January 10, 2024, **ALHATTAB** had a telephone call with **DAVIS**.

49. On or about January 10, 2024, **ALHATTAB** instructed Individual-B to go to the Donaldsonville OMV office and approach a specific desk.

50. On or about January 10, 2024, at the Donaldsonville OMV office, **DAVIS**, who was working at the desk **ALHATTAB** had specified, issued Individual-B a Class A CDL.

*Overt Acts Concerning Individual-C*

51. On or about December 20, 2023, **ALHATTAB** placed a telephone call to **DAVIS**.

52. On or about December 20, 2023, about 27 minutes after the telephone call from **ALHATTAB**, **DAVIS** conducted internet research concerning knowledge test questions to aid her in completing the knowledge test for Individual-C.

53. On or about December 20, 2023, at the Donaldsonville OMV office, **DAVIS** issued Individual-C a commercial learner's permit.

54. On or about January 22, 2024, **ALHATTAB** sent **PARSONS**, via cell phone messaging, a photograph of Individual-C's commercial learner's permit.

55. On or about January 26, 2024, **PARSONS** falsely entered in the Training Provider Registry that Individual-C successfully completed Entry-Level Driver Training.

56. On or about January 27, 2024, **PARSONS** falsely entered in CSTIMS that Individual-C took and passed the skills test.

57. On or about January 27, 2024, **PARSONS** sent **ALHATTAB**, via cell phone messaging, a photograph of Individual-C's commercial learner's permit with the message "This guy is good to go to DMV, I'll have another one tomorrow."

58. On or about February 1, 2024, at the Donaldsonville OMV office, **DAVIS** issued Individual-C a Class A CDL.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 – 4
### (Honest Services Wire Fraud)

**A.     AT ALL TIMES MATERIAL HEREIN:**

59. The allegations contained in Count 1 are incorporated here.

60. Beginning at a time unknown, but no later than August 2020, and continuing until in or about February 2024, defendants **MAHMOUD ALHATTAB, CHRISTOPHER BRYAN BURNS, JENAY DAVIS, SHAKIRA MILLIEN, JONATHAN PARSONS,** and **MARLINE ROBERTS** devised and intended to devise a scheme to defraud the state of Louisiana, its citizens, and DPSC of the honest services of **BURNS, DAVIS, MILLIEN, PARSONS,** and **ROBERTS**, through their soliciting and accepting of bribes.

61. On or about the dates listed below, in the Eastern District of Louisiana and elsewhere, the below-indicated defendants for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals, that is, entry in CSTIMS of skills test results for the below-indicated CDL applicant, each transmission constituting a separate count:

| Count | Date | Defendants | CDL Applicant |
|---|---|---|---|
| 2 | February 18, 2023 | **ALHATTAB, PARSONS,** and **ROBERTS** | Individual-A |
| 3 | December 26, 2023 | **ALHATTAB, BURNS,** and **MILLIEN** | Individual-B |
| 4 | January 27, 2024 | **ALHATTAB, DAVIS,** and **PARSONS** | Individual-C |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNTS 5 – 8
### (Bribery Concerning Programs Receiving Federal Funds)

**A.     AT ALL TIMES MATERIAL HEREIN:**

62. The allegations contained in Section A of Count 1 are incorporated here.

63. In or about the time periods indicated below, in the Eastern District of Louisiana and elsewhere, **MAHMOUD ALHATTAB** did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward an agent of DPSC, a Louisiana State agency that received federal assistance in excess of $10,000 during a one-year period that included the below-listed time period, in connection with a transaction and series of transactions of DPSC involving $5,000 or more:

| Count | Time Period |
|---|---|
| 5 | August 10, 2020, through July 11, 2021 |
| 6 | October 28, 2021, through July 14, 2022 |
| 7 | August 2, 2022, through July 31, 2023 |
| 8 | August 5, 2023, through February 26, 2024 |

All in violation of Title 18, United States Code, Section 666(a)(2).

## COUNTS 9 – 19
### (Bribery Concerning Programs Receiving Federal Funds)

A. **AT ALL TIMES MATERIAL HEREIN:**

64. The allegations contained in Section A of Count 1 are incorporated here.

65. In or about the time periods indicated below, in the Eastern District of Louisiana and elsewhere, the below-indicated defendant, being an agent of DPSC, a Louisiana State agency that received federal assistance in excess of $10,000 during a one-year period that included the below-listed time period, did corruptly solicit and demand for the benefit of any person, and did accept and agree to accept, a thing of value from a person, intending to be influenced and rewarded in connection with a transaction and series of transactions of DPSC involving $5,000 or more:

| Count | Time Period | Defendant |
|---|---|---|
| 9 | August 25, 2023, through January 7, 2024 | CHRISTOPHER BRYAN BURNS |
| 10 | March 6, 2023, through February 6, 2024 | JENAY DAVIS |
| 11 | August 10, 2020, through June 28, 2021 | SHAKIRA MILLIEN |
| 12 | October 28, 2021, through June 30 2022 | SHAKIRA MILLIEN |
| 13 | August 2, 2022, through July 25, 2023 | SHAKIRA MILLIEN |
| 14 | August 8, 2023, through February 26, 2024 | SHAKIRA MILLIEN |

| 15 | September 3, 2020, through July 11, 2021 | **JONATHAN PARSONS** |
| 16 | October 30, 2021, through July 14, 2022 | **JONATHAN PARSONS** |
| 17 | August 19, 2022, through July 31, 2023 | **JONATHAN PARSONS** |
| 18 | August 5, 2023, through February 24, 2024 | **JONATHAN PARSONS** |
| 19 | January 29, 2023, through February 20, 2023 | **MARLINE ROBERTS** |

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## NOTICE OF FORFEITURE

1. The allegations of Counts 1 through 19 of this Indictment are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offenses alleged in Counts 1 through 19, the defendants, **MAHMOUD ALHATTAB, CHRISTOPHER BRYAN BURNS, JENAY DAVIS, SHAKIRA MILLIEN, JONATHAN PARSONS**, and **MARLINE ROBERTS**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to said offenses, including but not limited to:

$56,367.00 in United States currency seized from 3911 Hudson Street, Metairie, Louisiana.

3. If any of the above-described property, as a result of any act or omission of the defendants:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

16

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendants up to the value of said property.

A TRUE BILL:

[redacted]

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

CHANDRA MENON
Assistant United States Attorney

New Orleans, Louisiana
August 28, 2025

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

## THE UNITED STATES OF AMERICA

vs.

**MAHMOUD ALHATTAB**
**CHRISTOPHER BRYAN BURNS**
**JENAY DAVIS**
**SHAKIRA MILLIEN**
**JONATHAN PARSONS**
**MARLINE ROBERTS**

## INDICTMENT FOR CONSPIRACY TO COMMIT HONEST SERVICES WIRE FRAUD, HONEST SERVICES WIRE FRAUD, AND BRIBERY CONCERNING PROGRAMS RECEIVING FEDERAL FUNDS

**VIOLATIONS:**
18 U.S.C. § 666(a)(2)
18 U.S.C. § 666(a)(1)(B)
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 1349

_____ A.D.

2025.

_____ Clerk

Bail, $ _____

**CHANDRA MENON**
Assistant United States Attorney